Reversing.
Prior to the spring and summer of 1923, S. M. and G. B. Maggard, father and son, were partners engaged in the retail mercantile business at Prestonsburg. They had done a large business and were apparently prosperous before that time. They owned a storehouse and dwelling-house, and the younger Maggard owned a one-half *Page 287 
interest in his own home, while his wife owned the other half.
For some reason, not fully explained, in the spring and summer of that year they got behind in the payment of their bills to wholesale houses, and in the latter part of the summer and the earlier part of the fall some of their checks went to protest, and several suits were instituted against them. Their business was apparently dull during the summer, for it is disclosed that sometimes for a period of two or three days their business house was not opened for business, and that the younger member of the firm was frequently away from home engaged in other business activities. In this situation about August or September they sold to one person a bill of $2,887.00 out of their stock of merchandise, and later, on or about the 10th of November, sold both the dwelling-house and the storehouse which the members of the firm owned. About that time, in addition to the suits that had been filed against them, there were in the hands of different attorneys at Prestonsburg numerous other claims against them for collection, and some judgments had gone against them and other suits were pending.
It was generally known and understood in the community that they were in financial difficulties, and the general opinion prevailed that they were insolvent.
In this situation appellees, Cobb Co., a wholesale house at Charleston, W. Va., had their credit man and sales manager go to Prestonsburg on or about the 18th of November. He found the younger Maggard away from home, but was informed he would return on the night of the 19th, and was further informed by inquiry at the bank that the Maggards had two well secured notes, payable to themselves, aggregating something over $1,900.00. He therefore awaited the return of the junior member of the firm, met him at the train on the 19th, and after a conference induced him to assign those two notes to the firm of Cobb Company in payment of their claim, which was considerably less in amount, with the understanding that the surplus over and above their claim should be paid to the appellees, Fields Company, another Charleston wholesale firm having a claim against the Maggards. That was on the 19th of November, just about eight or nine days after the Maggards had sold all the firm's available real estate, and a month or two after they had sold the large bill of $2,887.00 out of their stock. During the period covered by the three transactions *Page 288 
immediately above referred to, the Maggards were contemplating an assignment, and the community generally recognized their precarious financial condition; and then on the 3rd of December thereafter they actually made a deed of assignment.
Then, on or about the fourth of January, 1924, certain creditors brought a suit whereby the firm was thrown into involuntary bankruptcy, and was shortly thereafter adjudged to be bankrupt. In that action appellant was named as trustee for the creditors of the bankrupt firm, and instituted these two actions against Cobb Company and Fields Company to have declared as a preference the assignment of the two notes as above set forth, and for judgment against them for the use and benefit of all the creditors.
Issues were made as to the insolvency of the Maggards, as to their purpose to give a preference to defendants, or either of them, and as to the knowledge or opinion or belief of defendants, or either of them, when they accepted the assignment of the notes that they were thereby receiving a preference over other creditors of the same class.
Upon submission the chancellor below dismissed the petitions after consolidating the actions, and from that judgment the trustee is appealing.
The bankruptcy statute provides:
 "If a bankrupt shall have procured or suffered a judgment to be entered against him in favor of any person, or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the recording or registry of the transfer, if by law recording or registry thereof is required, and being within four months before the filing of the petition in bankruptcy, or after the filing thereof and before the adjudication, the bankrupt be insolvent, and the judgment or transfer then operates as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."
The facts we have above recited are now all practically admitted, and it is now admitted that on the 19th *Page 289 
of November when the transfer was made the Maggards were insolvent. The judgment of the chancellor was based on his belief that the plaintiff had failed to show any intention upon the part of the bankrupts to create a preference, or that at the time of the transfer the defendants had such knowledge, or were in possession of such facts as were calculated to produce a belief in their minds that the receipt of the payments would result in a preference to them over other creditors of the same class.
A careful reading of the record, and taking in consideration all the facts and circumstances in evidence, impels us to a different conclusion.
The agent spent a part of one day and the whole of another in Prestonsburg before this assignment was made; he was the credit manager of a wholesale firm, and as such was almost necessarily a shrewd business man; during all the time he was at Prestonsburg before this transfer it was generally understood and known in that comparatively small city not only that the Maggards had not been meeting their bills, but that their checks had recently gone to protest, that several suits had recently been filed against them, that many other claims were in the hands of attorneys upon which suits would be brought, to say nothing of the fact that they had only a few days before sold and conveyed most of their visible real estate, and a short time before that had sold a large bill of nearly $3,000.00 out of their stock to one man. It is difficult to believe that a shrewd and alert business man, which the ordinary credit manager is, could spend 36 or 48 hours in a small town and not receive information in one way or another that his debtor who owed a considerable bill past due was not insolvent under these circumstances. That agent testifies himself that it was a part of his duty to inquire into the standing of persons with whom his firm did business, and particularly, we should say, was it his duty to investigate the standing of a debtor who owed his firm a past due debt. In addition we have his admission that he went to a banker in the town and learned there that this firm was in financial difficulties and that its checks had gone to protest. Not only so, we find that agent so solicitous of this claim against the Maggards that he remains at Prestonsburg longer than he had expected in order to see the younger member of the firm when he returned from a business trip, and to persuade him to transfer those notes which he had learned at the bank he had. It is likewise disclosed *Page 290 
by the evidence of the younger Maggard that when the credit manager met him at the train he at first hesitated whether or not he would assign the notes to him, and admitted that he then thought of "dividing the thing up and letting it go as far as it would;" but when the agent told Maggard there was another man in town that wanted to get the notes, and insisted upon their assignment to his firm, Maggard said to him: "if he felt that way about it I had about as well let him have it as the other fellows."
It is hardly believable in the light of this testimony of Maggard that either of the men to that transaction did not know at the time that the one was giving and the other receiving a preference over other creditors of the same class.
One phase of the case of Russell's Trustee v. Mayfield Lumber Company, 158 Ky. 219, is strikingly similar to the facts here. The question there was did a creditor have reasonable cause under the statute to believe that a preference was intended, and the court in response to that inquiry said:
 "Though he says that he did not know the bankrupt had any other creditors, he did know that the bankrupt was unable to pay his debts, and that he had virtually abandoned his business. The slightest inquiry on his part would have developed the true situation. Whatever fairly puts a party upon inquiry is sufficient notice, where the means of knowledge are at hand, and if a party, under such circumstances, omits to inquire, and proceeds to receive the transfer, he does so at his peril, and is chargeable with knowledge of all the facts which by proper inquiry he might have ascertained."
Applying the rule there laid down to the facts of this case the credit manager is chargeable with the knowledge which he might easily have acquired by inquiry in Prestonsburg, which would have unmistakably shown to him facts which would have disclosed to him he was accepting a preference over other creditors of the same class.
The judgment is reversed, with directions to enter a judgment against the parties accepting the preferential transfers. *Page 291